**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        v.                              Case No. 03-C-0944

**JOSIAS KUMPF,**

        **Defendant.**

## DECISION AND ORDER

Plaintiff, the United States Government ("Government"), brings this action seeking to revoke the naturalized United States citizenship of defendant, Josias Kumpf, on a number of legal grounds stemming from his service during World War II as a guard at Nazi concentration and forced labor camps. Plaintiff alleges that I have jurisdiction based on 28 U.S.C. § 1345 (conferring on district courts jurisdiction of civil actions commenced by the United States) and 8 U.S.C. § 1451(a) (conferring on district courts jurisdiction of actions to revoke citizenship). In Count I of its four-count complaint, the Government seeks denaturalization on the ground that defendant procured admission to the United States in violation of the Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400 (1953), amended by Pub. L. No. 83-751, 68 Stat. 1044 (1954) ("RRA"), under which, the Government contends, he was ineligible for admission based on his service as an armed SS camp guard. In Count II, the Government seeks denaturalization on the ground that defendant procured admission to the United States in violation of the RRA and the

Immigration and Nationality Act ("INA") by falsely claiming that he served in the German Army and concealing his service as an SS camp guard. In Count III, the Government seeks denaturalization on the ground that defendant procured citizenship in violation of the INA by falsely claiming that he served in the German Army and concealing his SS guard service. In Count IV, the Government seeks denaturalization on the ground that defendant procured citizenship in violation of the INA by lying about his wartime activities during his naturalization interview, thus demonstrating his lack of good moral character. Before me now are defendant's motions to dismiss based on the absence of subject matter jurisdiction, expiration of the RRA, and denial of equal protection, and the parties' cross motions for summary judgment.

## I. FACTS

In 1933, the Nazi government of Germany began seizing innocent people and holding them in concentration camps, among which was the Sachsenhausen camp about twenty miles north of Berlin. The Nazis assigned responsibility for managing the concentration camps to the SS (Schutzstaffel), an entity separate from the Wehrmacht (German Armed Forces). The SS included a unit known as the Waffen SS (armed SS), and the Waffen SS contained a section known as the Totenkopfsturmbanne ("Death's Head" Battalion) that generally guarded concentration camps.

Defendant, a Yugoslavian-born, ethnic German, served in the German Waffen SS from October 1942 until May 1945 when the war ended. From October 1942 until about October 1943, he served as an armed guard at Sachsenhausen, where the Nazis confined, brutalized and murdered thousands of prisoners because of race, religion, national origin

or political opinion. Defendant commenced service as a private and received one promotion. The Nazis paid defendant for his service and provided him with an SS uniform, which he wore, and a distinctive SS tattoo. They trained him to use weapons and to prevent prisoners from escaping, if necessary, by shooting them. Defendant performed armed guard duty at Sachsenhausen on a daily basis including repeated duty in the camp's guard towers. He knew that Sachsenhausen had gas chambers stating, "I hear they put people in and that's all. They don't come out no more, that's what I hear." (Kumpf Dep. at 69:7-69:19.) The Nazis gave defendant several leaves during which he visited Berlin and also visited his family in Yugoslavia.

In approximately October 1943, the Nazis transferred defendant and other guards to the SS Training Camp Trawniki in occupied Poland, a camp jointly operated by the SS and the German police. The SS also operated an adjoining labor camp where about 8,000 Jewish prisoners including at least 400 children were held. On November 3, 1943, the Nazis murdered the prisoners in pits. Defendant arrived at Trawniki, at the latest, one day after the massacre and stood guard near the pits where the massacre occurred with instructions to shoot prisoners who attempted to escape, including those who in his words were "still halfway alive." (Id. at 88:14-21.) Some prisoners escaped, but in the following weeks, the Nazis caught and killed most of them. The Nazis brought in 100-150 Jewish men to incinerate the corpses of the victims and killed them afterwards. Defendant recalled that the smell of the burnt bodies of murdered prisoners at Trawniki resembled "burnt meat" on a barbecue. (Id. at 92:8-14, 94:9-18.) While serving at Trawniki, defendant received leave and went home to visit his family. While on leave, he wore his

SS uniform to a photographic studio and had his picture taken with his sister and two of her friends. (Id. at 20:21-22:6; Def.'s Photo No. 2.)

In 1944, the Nazis sent defendant to France where, among other things, he guarded prisoners who were forced to construct launch sites for German missiles.

At the end of the war, the Soviets captured defendant and held him as a prisoner of war. During this period, defendant discarded his SS uniform and had his SS tattoo removed with acid to avoid being identified as an SS man. When the Soviets released him, he joined his family at a displaced persons' camp in Austria.

In 1951, defendant considered immigrating to the United States, but did not apply for a visa because he had heard that the United States would not accept former SS members.[1] However, in 1956, in Salzburg, Austria, he applied for an immigrant visa under the RRA and represented his place of residence from 1942-1945 as "German Army: Germany, Poland, France." (Def.'s Application for Visa ¶ 26.) Ambassador Richard Bloomfield, who served as American vice-consul in Salzburg and who had a practice of asking male applicants about their wartime activities, interviewed defendant. Defendant told Bloomfield that he had served in a combat unit and did not disclose his service as an armed SS guard fearing that, had they known of it, U.S. officials would "probably" have not permitted him to immigrate. (Kumpf Dep. at 118:18-119:13, 125:10-19.) Bloomfield stated

---

[1] The Displaced Persons Act, Pub. L. No. 80-774, 62 Stat. 1009 (1948) ("DPA"), which was in effect between 1948 and 1953, governed whether defendant was eligible for a visa in 1951. The DPA made persons who had "assisted the enemy in persecuting civilians" and persons who had "voluntarily assisted the enemy forces in their operations" ineligible for visas. See Fedorenko v. United States, 449 U.S. 490, 495 (1981) (internal quotation marks and alterations omitted).

that if he had known of defendant's wartime assignments or of defendant's misrepresentation, he would have denied defendant's visa application.

In March 1956, the United States issued defendant an immigrant visa and in February 1964, defendant applied for naturalization as a United States citizen. Form N-400, question 7, asked defendant to list his past and present membership "in every organization, association, fund, foundation, party, club society, or similar group," as well as his "foreign military service." (Naturalization Application Answer ¶ 30.) Defendant instructed his wife, who filled out the form on his behalf to write "German Army, 1942 to 1945." (Kumpf Dep. at 133:10-23.) During his deposition, defendant admitted that he instructed his wife to answer the question in this way because he believed that if he indicated that he served in the SS, his application would probably not be approved. Further, an INS naturalization examiner interviewed defendant and asked him if he had been in the German Army to which defendant responded affirmatively. Defendant represented to the examiner that he had served in a combat unit and did not disclose his SS membership or activities. Defendant did not disclose such service because "I was happy I was in America and I tried to stay here." (Id. at 143:10-17.) Defendant signed Form N-400 and swore that his answers were true. Subsequently, the District Court for the Northern District of Illinois naturalized him.

I will add additional facts in the course of the decision.

## II. DISCUSSION

I will first address the aspects of defendant's motion to dismiss based on the absence of subject matter jurisdiction, the expiration of the RRA, and equal protection.

- 5 -

Case 2:03-cv-00944-LA   Filed 05/10/05   Page 5 of 16   Document 51

Because these aspects of the motion do not rely on material outside the pleadings, I will consider them under the standard applicable to motions brought under Fed. R. Civ. P. 12(b).  Because the remaining aspects of defendant's motion rely on matters outside the pleadings, I will consider them under the standards applicable to summary judgment motions, see id.; Fed. R. Civ. P. 56, and discuss them in conjunction with plaintiff's motion for summary judgment.

**A.      Motion to Dismiss**

    **1.      Subject Matter Jurisdiction**

Pursuant to Fed. R. Civ. P. 12(b)(1), defendant moves to dismiss Counts I and II of the complaint based on the absence of subject matter jurisdiction.  Defendant argues that I have no jurisdiction to determine visa eligibility because no statute grants district courts jurisdiction to review a decision to issue a visa.  He also argues that separation of powers principles prevent district courts from reviewing a decision to issue a visa because such review would involve the judiciary encroaching upon the province of the Executive Branch.  However, the Seventh Circuit has already rejected these arguments.  See United States v. Tittjung, 235 F.3d 330, 335-39 (7th Cir. 2000).

First, as stated in Tittjung, 8 U.S.C. § 1451(a) provides district courts with subject matter jurisdiction over actions seeking to revoke a certificate of naturalization when that order is based on an illegally obtained visa.  Id. at 337 (stating "unequivocally that Article III courts have jurisdiction to vacate an order of naturalization when that order is based on an illegally obtained visa").  Second, Tittjung recognized that separation of powers principles do not preclude district courts from setting aside a certificate of naturalization

- 6 -

founded upon an illegally obtained visa because Congress, the branch of government which the Constitution empowered to establish standards for immigration, delegated to the Judiciary authority to revoke certificates of naturalization when such certificates are based on illegally obtained visas. Id. at 337-39. Thus, I must reject defendant's argument challenging subject matter jurisdiction.

### 2. Expiration of RRA

Defendant next argues that because the RRA expired before his naturalization and is no longer in force, I may not consider it in determining whether he was lawfully admitted to the United States. The Seventh Circuit also rejected this argument in Tittjung. There, a defendant who obtained his visa under the DPA argued that the expiration of the DPA prevented the district court from considering it in determining whether to revoke his citizenship. Id. at 339-40. The Seventh Circuit held that because the DPA controlled whether the defendant was lawfully admitted to the United States, and because the law in effect at the time the defendant was naturalized made lawful admission a prerequisite to naturalization, the district court was required to consider the DPA in making its revocation decision. Similarly, in the present case, the RRA controlled whether defendant gained lawful admission to the United States and the law in effect when defendant was naturalized made lawful admission a prerequisite to naturalization. See 8 U.S.C. § 1427(a). Thus, based on Tittjung, I must reject plaintiff's claim that the expiration of the RRA before his naturalization precludes me from finding that he unlawfully procured admission to the United States.

### 3. Equal Protection

- 7 -

Next, defendant argues that by revoking his citizenship, I would violate his right to equal protection because a concentration camp guard who entered the United States at a later date and under a different law might not be subject to denaturalization on the same grounds as he. The argument is without merit. In Turkhan v. Perryman, 188 F.3d 814, 828 (7th Cir. 1999), the Seventh Circuit explained:

> Congress need not treat all aliens alike if there is a legitimate reason for treating them differently . . . . As long as a statutory classification or distinction does not impinge on any fundamental rights or target any suspect class, it will not be found to run afoul of the Equal Protection Clause provided there is a rational basis for the classification.

Defendant is not a member of a protected class nor does his admission to the United States involve a fundamental right. See Linnas v. INS, 790 F.2d 1024, 1032 (2d Cir. 1986) (stating that persons who assisted the Nazis are not a protected class).

Moreover, Congress "need not treat all aliens alike if there is a legitimate reason for treating them differently." Turkhan, 188 F.3d at 828. A classification must be upheld against an equal protection challenge "'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Id. (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)). In enacting the DPA, Congress had a legitimate interest "to ensure that the United States is not a haven for individuals who assisted the Nazis" in persecution and murder. Schellong v. INS, 805 F.2d 655, 662 (7th Cir. 1986). The same is true of the provision of the RRA that made persons who personally assisted in persecution ineligible for visas. If, after the RRA expired, the Government applied different standards for admission to meet changing policy objectives, plaintiff would not as a result have a valid equal protection claim. "It is no requirement of equal protection that all evils of the same

- 8 -

genus be eradicated or none at all." Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 110 (1949).

**B.     Summary Judgment on Count I**

I must analyze the parties' cross-motions for summary judgment under the standard provided in Fed. R. Civ. P. 56(c).  Under such standard, I will grant summary judgment if the evidence shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment, I draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  When both parties have moved for summary judgment, both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion.  If issues of fact exist, neither party is entitled to summary judgment.  Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voight, 700 F.2d 341, 349 (7th Cir. 1983).

Although plaintiff has moved for summary judgment on Counts I, II and III and defendant has moved for summary judgment on all counts, I address only plaintiff's motion for summary judgment on Count I because it is dispositive of this case.  In doing so, I consider plaintiff's substantive evidentiary burden.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  Because few rights are as important as the right to acquire and retain American citizenship, the Government carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship.  United States v. Lileikis, 929 F. Supp. 31, 36 ( D. Mass. 1996).  That burden requires the Government to present "clear,

unequivocal and convincing" evidence supporting denaturalization. Fedorenko, 449 U.S. at 505. On the other hand, American citizenship is bestowed only upon those who meet fundamental standards imposed by law. For this reason, courts must require "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." Id. at 506. Indeed, the Supreme Court has ruled that "district courts lack equitable discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally." Id. at 517; see also 8 U.S.C. § 1451(a).

In Count I, plaintiff seeks to denaturalize defendant pursuant to Section 340(a) of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1451(a), which requires a court to revoke naturalized citizenship that a person "illegally procured." See Fedorenko, 449 U.S. at 506-07. A person illegally procures citizenship if he fails to satisfy the statutory conditions for naturalization. Id. at 506, 515 n.38. One such condition is that the person be "lawfully admitted for permanent residence." 8 U.S.C. § 1427(a)(1). A person is not lawfully admitted for permanent residence unless admitted pursuant to a valid immigrant visa. 8 U.S.C. § 1181(a); see also Fedorenko, 449 U.S. at 406, 508; Tittjung 235 F.3d at 336-37.

Defendant entered the United States under a visa obtained pursuant to the RRA; thus, the legality of his naturalization turns on whether he was eligible for such visa. Section 14(a) of the RRA prohibited the issuance of a visa to "any person who personally advocated or assisted in the persecution of any person or groups of persons because of race, religion or national origin." The RRA did not define "persecution," but in the immigration context, the word refers to "the infliction of suffering or harm, under

government sanction, upon persons who differ in a way regarded as offensive (e.g., race, religion, political opinion, etc.)." Schellong, 805 F.2d at 662.

It is undisputed that defendant served as a guard at places of persecution. The Sachsenhausen concentration camp, the SS labor camp Trawniki and the construction site in occupied France where defendant guarded forced laborers were places of persecution. See, e.g., United States v. Reimer, 356 F.3d 456, 459-61 (2nd Cir. 2004) (stating that Trawniki was a place of persecution); Hammer v. INS, 195 F.3d 836, 844 (6th Cir. 1999) (stating that "Nazi concentration camps were places of persecution"); United States v. Kairys, 782 F.2d 1374, 1378 (7th Cir. 1986) (stating that there is no basis for distinguishing service as armed guard at Nazi forced labor camp from service as a guard at a concentration camp). However, defendant argues that the Government failed to establish that he "personally advocated or assisted" in the persecution of prisoners held at the above locations. RRA § 14(a). As explained below, I conclude that the Government has met its burden.

In Fedorenko, the Supreme Court discussed how to determine whether a person "assist[ed] in the persecution of civilians" under the DPA:

> The solution . . . lies . . . in focusing on whether particular conduct can be considered assisting in the persecution of civilians. Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems.

449 U.S. at 512 n.34 (emphasis in original). Cases applying Fedorenko have made clear that armed guards at Nazi concentration and forced labor camps assisted in persecution regardless of whether they personally committed atrocities. Proof of an individual's service as an armed, uniformed Nazi guard "is sufficient to establish that he assisted in persecution." United States v. Schmidt, 923 F.2d 1253, 1258-59 (7th Cir. 1991) (holding that under Fedorenko armed guard at Sachsenhausen assisted in persecution as a matter of law even without evidence that guard himself engaged in acts of violence); see also Negele v. Ashcroft, 368 F.3d 981, 984 (8th Cir. 2004) (stating that by impeding prisoners' escape through his presence as an armed SS Death's Head Battalion guard, defendant was actively and personally involved in persecution); Kairys, 782 F.2d at 1377 n.3 (applying Fedorenko to service in SS-run labor camp where guard was uniformed, armed, paid and allowed to leave camp on furlough); United States v. Hutyrczyk, 803 F. Supp. 1001, 1008-09 (D. N.J. 1992) (stating that government need not prove that an individual fired a weapon at, or was under orders to fire weapon at a fleeing inmate in order to establish assistance in persecution). Hutyrczyk explained that a guard assisted in persecution because "without individuals guarding the perimeter of the camp at night ensuring that no Jew escaped, the cruel treatment would not have been able to continue." 803 F. Supp. at 1009-10.

     As noted, courts developed the Fedorenko "assistance in persecution" standard with reference to the DPA, and the RRA made only those who "personally advocated or assisted" in persecution ineligible for a visa. RRA § 14(a) (emphasis added). Defendant argues that by adding the qualifying term "personally" to the RRA, Congress intended to allow persons who served as concentration camp guards but did not commit more severe atrocities to obtain visas.

- 12 -

Case 2:03-cv-00944-LA   Filed 05/10/05   Page 12 of 16   Document 51

The courts that have considered the meaning of "personally advocated or assisted" in persecution under the RRA have found its meaning unambiguous and that it included those who served as concentration camp guards. See United States v. Friedrich, 402 F.3d 842, 845-46 (8th Cir. 2005) ("Friedrich II"); United States v. Hansl, No. 03-CV-90406, 2005 WL 803445, at *8 - 9 (S.D. Iowa Apr. 8, 2005); United States v. Friedrich, 305 F. Supp. 2d 1101, 1106-08 (E.D. Mo. 2004) ("Friedrich I"). In Hansl, the court relied on the ordinary meaning of "personally" and held that § 14(a) of the RRA disqualified persons who "on or for [their] own part" advocated or assisted in persecution. 2005 WL 803445, at *9. Further, the district court in Friedrich I determined that "the word 'personally' [did not] equate with 'more egregious,' or 'more specific' acts of persecution, such as whipping, beating, or killing others." 305 F. Supp. 2d at 1106. The district court determined that Congress added the word "personally" to the RRA in order to emphasize that persons were not disqualified from obtaining visas simply because they were members of an organization that committed or advocated acts of persecution. Id. at 1106-07.

I find the reasoning of both the district and appellate courts in Friedrich and the district court in Hansl persuasive. Under the plain meaning of the RRA, an individual that served as a guard at places of persecution "personally advocated or assisted" in the persecution that took place at those places by preventing the victims of persecution from escaping their inhumane treatment. Friedrich II, 402 F.3d at 845-46; Hansl, 2005 WL 803445, at *12; Friedrich I, 305 F. Supp. 2d at 1107. Nothing in the phrase "personally advocated or assisted" limits its applicability to those who actually harmed prisoners or witnessed direct acts of persecution up close. Friedrich II, 402 F.3d at 845; Friedrich I, 305 F. Supp. 2d at 1107. As explained by the district court in Friedrich I, to the extent that

- 13 -

Congress intended to change the DPA standard by adding "personally" to the RRA, it used "personally" to emphasize that those who were merely members of an organization that advocated or assisted in persecution were not automatically ineligible for visas. 305 F. Supp. 2d at 1106-07. Thus, I conclude that under the RRA, a person who served as a guard at a camp or prison in which prisoners were subject to persecution "personally advocated or assisted" in the persecution of those prisoners.[2]

In the present case, the Government has demonstrated by clear, unequivocal and convincing evidence that defendant personally assisted in the persecution of prisoners within the meaning of the RRA. Defendant served as an armed guard at Nazi concentration and forced labor camps, and by virtue of such service, personally prevented prisoners from escaping. Defendant admitted in his deposition that he stood guard while armed with a rifle in the guard towers at Sachsenhausen, on the perimeter of the killing pits at Trawniki and at a forced labor camp in occupied France. He also admitted that his instructions were to watch for any prisoner who tried to escape and to stop them by shooting them if necessary. Defendant provided several descriptions of his work at Trawniki. He stated:

> I was watching them shoot some people and some of them come out and run away again. There was hurt [sic] and not enough so still convulse, some of them, you know. That's what we have to watch. . . . Some people was

---

[2]Defendant argues that the vice consuls responsible for determining whether an individual was eligible for a visa under the RRA interpreted the Act as allowing admitted concentration camp guards to obtain visas as long as they did not commit direct acts of persecution, and that I should defer to this interpretation. However, courts have already determined that deference to the vice consuls' interpretations of the RRA would be inappropriate, Friedrich II, 402 F.3d at 846 n.5; Hansl, 2005 WL 803445, at *10; Friedrich I, 305 F. Supp. 2d at 1107-08, and I reject defendant's argument in the present case for the same reasons.

> shot and not good enough so they was still able to move, you know. That's what we have to watch outside so that they don't go no place.

(Kumpf Dep. at 73:23-74:5.) He also stated:

> After I was finished with my breakfast, I have coffee on rye bread with butter, that's all I know. I get and then out, out, out, out, out, take your rifle and go and stay around and some of them move. I say what we have to watch, they say some of them are still halfway alive and they run out. So – and then I say if somebody come like that, shoot them to kill, shoot to kill.

(Id. at 88:14-21.) Defendant's admissions make clear that he was more than simply a member of an organization that persecuted civilians and that he "personally advocated or assisted" in persecution. As a result, he was ineligible for a visa under the RRA and was therefore unlawfully admitted to the United States.[3] Accordingly, pursuant to 8 U.S.C. § 1451(a), I will order that his citizenship be revoked.

## III. CONCLUSION

For the reasons stated, there is no genuine issue of material fact in connection with Count I, and the Government is entitled to summary judgment on such count. The Government has submitted clear, unequivocal evidence showing that defendant obtained his naturalization unlawfully. Therefore, defendant must be denaturalized. Because my

---

[3] Defendant also argues that he was not ineligible for a visa under the RRA because he was involuntarily conscripted into the SS. However, in Fedorenko, the Supreme Court found that the omission of the word "voluntary" from the DPA "compels the conclusion that the statute made all those who assisted in the persecution of civilians ineligible for visas," not just those whose assistance in persecution was voluntary. 449 U.S. at 512. Like the DPA, the RRA included no voluntariness provision. See Hansl, 2005 WL 803445, at *9-*10 (stating that "if Congress wanted to impose a voluntariness requirement in the RRA, it clearly could have done so. Congress did not, however, impose such a requirement"). Thus, the RRA made defendant ineligible for a visa even though his service in the SS may have been conscripted.

decision on Count I is dispositive of this case, I need not address the parties' arguments pertaining to Counts II, III and IV.

**THEREFORE, IT IS ORDERED** that defendant's motion to dismiss is **DENIED** and the Government's motion for summary judgment on Count I is **GRANTED.**

**IT IS FURTHER ORDERED** that the court order dated May 9, 1964, admitting defendant to citizenship is **REVOKED** and that Certificate of Naturalization No. 8707719 is **CANCELLED**.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10 day of May, 2005.

/s_____
LYNN ADELMAN
District Judge